UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DAYLAN BRADSTREET #573213** | **CIVIL ACTION** |
| **VERSUS** | **NO. 18-6778** |
| **DARREL VANNOY, WARDEN** | **SECTION: "F"(1)** |

### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

### State Court Factual and Procedural Background

Petitioner, Daylan Bradstreet, is a state prisoner incarcerated at the Louisiana State Penitentiary in Angola, Louisiana. On April 3, 2014, Bradstreet was charged by a bill of information with two counts of attempted second degree murder in violation of La. Rev. Stat. § 14:27.30.1 and one count of aggravated criminal damage in violation of La. Rev. Stat. § 14:55.[1] On May 18, 2015, after a bench trial, petitioner was convicted as charged.[2] On May 28, 2015, the trial court sentenced petitioner to forty (40) years as to counts one and two and fifteen (15) years as to count three, all terms of

---

[1] State Rec., Vol. 1 of 7, Bill of Information dated April 3, 2014.
[2] State Rec., Vol. 2 of 7, minute entry dated May 11, 2015; minute entry dated May 12, 2015; minute entry dated May 15, 2015; minute entry dated May 18, 2015; State Rec., Vol. 5 of 7, trial transcript of May 11, 2015; State Rec., Vol. 6 of 7, trial transcript of May 11, 2015 (con't); trial transcript of May 12,2015; trial transcript of May 15,2015; transcript of verdict of May 18, 2015.

1

imprisonment to be served at hard labor without the benefit of probation, parole, or suspension of sentence and to run concurrent with one another but consecutive to the sentence he was already serving.[3] Petitioner's motion to reconsider sentence was denied.[4]

The state filed a multiple bill charging petitioner as a second felony offender.[5] On August 17, 2015, the trial court found petitioner guilty of being a second felony offender and vacated the previous sentence of forty (40) years as to count one. The trial court resentenced petitioner as a double offender to a term of imprisonment of sixty-five (65) years at hard labor without the benefit of probation or suspension of sentence.[6]

On June 30, 2016, the Louisiana Fifth Circuit Court of Appeal affirmed petitioner's convictions and sentences.[7] The Louisiana Supreme Court denied writs without stated reasons on June 5, 2017.[8] Petitioner did not seek a petition for writ of certiorari with the United States Supreme Court.

On March 12, 2018, petitioner filed the instant federal application seeking habeas corpus relief in which he asserts that insufficient evidence supported his convictions.[9] The state filed a response conceding that the application is timely and that petitioner exhausted his remedies in the state courts. The state, however, claims that petitioner's claim has no merit.[10] Petitioner filed a reply.[11]

---

[3] State Rec., Vol. 2 of 7, minute entry dated May 28, 2015; State Rec., Vol. 6 of 7, sentencing transcript of May 28, 2015. The trial court also found petitioner in contempt of court after the judge witnessed him violating the court's directive not to communicate with anyone in the audience and petitioner was sentenced to six months flat time to be served consecutive to his other sentences.
[4] State Rec., Vol 2 of 7, minute entry dated May 28, 2015; State Rec., Vol. 6 of 7, sentencing transcript of May 28, 2015.
[5] State Rec., Vol. 1 of 7, multiple bill dated May 20, 2015.
[6] State Rec., Vol. 6 of 7, transcript of August 17, 2015.
[7] State v. Bradstreet, 196 So. 3d 876 (La. App. 5th Cir. 2016); State Rec., Vol. 6 of 7.
[8] State v. Bradstreet, 220 So. 3d 752 (La. 2016) (mem.); State Rec., Vol. 7 of 7.
[9] Rec. Doc. 6. "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner signed his petition on March 12, 2018. Rec. Doc. 6, p. 15.
[10] Rec. Doc. 9.
[11] Rec. Doc. 10.

**Standards of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the " 'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

3

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1705 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id., at 1706 (citations and quotation marks omitted). Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

4

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. White, 134 S. Ct. at 1701.

## Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

> Joseph Washington testified that on the evening of January 20, 2014, he drove to visit his friend, Troylynn Smith, at her home on Hooter Road.[5] He testified that he was speaking with Troylynn outside when two black males, wearing all black, approached them and asked, "What's up, T?" Immediately thereafter, he heard gunfire. Mr. Washington ran to the backyard, jumping over a fence to escape. He testified that the two men were chasing him through the backyard and that he jumped over two more fences to hide in bushes until the two men left. He testified that he was shot in the ankle but eventually crawled back to the front of the house. When questioned concerning the identity of the shooters, he stated that he could not identify either of the

5

men but that Troylynn told him at some point that one of the shooters lived on Hooter Road.

[5] Mr. Washington further testified that a friend accompanied him to Hooter Road, but remained in the vehicle and drove away upon hearing gunshots. A material witness warrant was issued for Mr. Washington's appearance and testimony at trial.

Troylynn[6] testified that she suffered from memory problems and was unable to remember anything from the night of the shootings.[7] She testified that she was talking with Mr. Washington in front of her house on January 20, 2014, when she was approached by two men and shot in the arm, legs, and abdomen. She testified at trial that she could not see the men's faces. She testified that she knows defendant from the neighborhood but testified that she could not identify defendant at trial as involved in the shootings. Troylynn further testified that she did not remember identifying defendant at the hospital after the shootings as the person who shot her but did acknowledge that her initials were placed on a photographic lineup next to defendant's picture.

[6] As there are multiple witnesses with the last name Smith, Troylynn will be identified by her first name only throughout this opinion.

[7] A material witness warrant was issued to compel Troylynn's testimony at trial.

Deputy Umakantbhai of the Jefferson Parish Sheriff's Office testified that he was the first responding officer on the scene. He stated that he was unable to speak with Troylynn but that he spoke with Mr. Washington, who informed him that two black males approached him and Troylynn. He further testified that Mr. Washington related to him that one of the individuals said, "What's up, T?" and then "shots rang out."

Detective Brandon Veal of the Jefferson Parish Sheriff's Office testified that he went to the hospital after the shooting to meet with Troylynn, but that she was heavily medicated and could not give a statement. He spoke with Troylynn's mother, Lynn Smith, who informed him that Troylynn had earlier told her that one of the shooters lived on Hooter Road. She further informed Deputy Veal that Troylynn gave her a description of the shooter's house on Hooter Road, "two houses down from Ms. Rita's house," and further provided the first few letters of the shooter's name. Detective Veal returned to the hospital a few days later, when Troylynn was coherent, and presented her with a photographic lineup. He testified that Troylynn identified defendant as the individual who shot her on the night of January 20, 2014. Detective Veal stated that Troylynn's identification was immediate and certain and that Troylynn immediately cried when she saw defendant's photograph.

Sergeant Robert Pellegrin of the Jefferson Parish Sheriff's Office testified that he took photographs and processed the crime scene. He testified that he recovered 29 casings. Jene Rauch, accepted as an expert in firearms and tool mark identification, testified that she examined the casings recovered from the scene and determined that three separate weapons were used to fire the casings recovered on the scene.

Troylynn's mother, Lynn, testified that she was washing dishes inside of her home when she heard gunshots. She testified that she went outside to find Troylynn lying on the ground near her vehicle in the driveway and, a few minutes later, she saw Mr. Washington crawling from the backyard with gunshot wounds to his ankle. She called 9–1–1 multiple times. She testified that she identified three bullet holes in her

6

car parked in the driveway and that those bullet holes were not present prior to the January 20, 2014 shootings.

Detective Harley Smith of the U.S. Marshal's Task Force testified that he, along with nine other marshals, arrived to 180 Fourth Street in Bridge City on February 20, 2014, to arrest defendant. He testified that he discovered defendant in the backyard of the residence and placed him under arrest. He testified that he handcuffed defendant and read him his Miranda[8] rights. Defendant subsequently told Detective Smith that he had heard from people in the neighborhood that the police were looking for him because of a shooting in the area.

[8]Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, (1966).

Deputy Jason Pryer with the "shoot squad" of the Jefferson Parish Sheriff's Office testified that he met with defendant at the Detective Bureau on February 20, 2014, and that defendant completed a waiver of rights form and agreed to make a statement. Defendant told him that he had been at the Daiquiri Shoppe at 6240 Lapalco Blvd. on the night of the shootings with his girlfriend, Perreill Chest, and her cousins watching a NFL football game. Deputy Pryor testified that after he discovered that no NFL football game was televised the night of the shootings, he asked defendant again as to his whereabouts on the night of the shootings. He testified that defendant recanted and wavered in his story, but then again stated clearly that he was inside of the Daiquiri Shoppe on Lapalco that night watching a football game.

Deputy Pryor contacted the manager of the Daiquiri Shoppe, who did not recognize defendant as a regular patron. He further acquired surveillance video from the Daiquiri Shoppe and testified that he did not observe defendant on the video surveillance from the night of the shooting. Deputy Pryor testified that he only viewed surveillance video from inside of the Daiquiri Shoppe and that the business did not have outdoor surveillance. During defendant's interview, another detective telephoned defendant's girlfriend, Perreill, who provided a statement inconsistent with defendant's statement concerning defendant's whereabouts on the night of the shootings. Deputy Pryor interviewed Perreill's cousins, Nikki Chest and Ireal Chest, who both informed him they had been at the Daiquiri Shoppe that evening with Perreill, but that defendant was not with them that night.

Perreill Chest, defendant's former girlfriend, testified at trial. Perreill testified that she was with her cousins at the Daiquiri Shoppe on the night of the shootings. She testified that defendant contacted her to pick him up at "eleven-something" that night and that she picked him up from Bridge City and brought him to her apartment in Boutte. When questioned regarding recorded phone conversations with defendant from prison, wherein Perreill expressed frustration with defendant, she explained that she was frustrated with defendant because he had involved her in the investigation, even though defendant knew she was not with him at the time of the shootings.

Nikki Chest testified at trial that she is Perreill's cousin. She testified that she and her cousins, including Perreill, arrived at the Martin Luther King, Jr. parade on January 20, 2014, at approximately 5:00 p.m. as it was ending, and then walked to the Daiquiri Shoppe on Lapalco Blvd. She testified that defendant was not with them at all that night. Perreill's other cousin, Ireal Chest, testified at trial that she knows defendant "very well" from the Bridge City neighborhood. She testified that she was with Perreill and her other cousins on the night of the shootings at the Daiquiri Shoppe on Lapalco Blvd. She also stated that defendant was not with them at all that night.

Susan Johnson, a T–Mobile senior specialist, testified regarding defendant's cell phone records. Ms. Johnson discussed the time that a cellular phone call was made or received on defendant's phone on the night of the shootings and the closest tower that the cellular signal "used" to make or receive those phone calls. Ms. Johnson testified that the records reflect a phone call made from defendant's cell phone at 5:49 p.m., which used a tower close to Hooter Road. The next phone call placed on defendant's phone occurred at 7:30 p.m., and that call also used the tower closest to Hooter Road. She testified that there were several text messages sent and received between 5:49 p.m. and 7:30 p.m., but that the records do not permit her to determine which tower was used for those text messages.

The cellular phone records, introduced into evidence at trial, reflect that more than 75 telephone calls were made or received with defendant's cell phone between 7:30 p.m. and 10:30 p.m. on the night of the shootings. Ms. Johnson testified that the only tower accessed by these 75 phone calls was the tower nearest to the scene of the crime. She further testified that the records reflect that no phone calls or text messages were received or made from 7:15 to 7:30 p.m. that night.[9]

[9] The application for the arrest warrant issued in connection with the shootings indicates that the shootings occurred at approximately 7:21 p.m. on January 20, 2014.

At trial, Troylynn testified that she had been threatened concerning her testimony to be provided at trial, but that defendant never contacted her or threatened her. Melanie Villemarette, a victim services coordinator at the Jefferson Parish District Attorney's Office, testified at trial that she met with Troylynn in her office on multiple occasions to discuss the facts surrounding the shootings. She testified that Troylynn created a hand-drawn map or drawing during one of these meetings, introduced into evidence, laying out the scene of the crime. Ms. Villemarette testified that Troylynn never expressed uncertainty about the events leading up to the shootings or in her identification of defendant as the individual who shot her.

Defendant testified at trial. Defendant testified that he could not recall specifically where he was on the night of January 20, 2014, but that he did recall arriving at the Daiquiri Shoppe between 6:00 p.m. and 6:30 p.m. to drop off money to his girlfriend, Perreill, for drinks. He testified that he never went inside the Daiquiri Shoppe. He stated that after he left the Daiquiri Shoppe, he "probably" went to his apartment "on Westwood" most "likely" with "another female."

Defendant admitted that he had been to his mother's house on Hooter Road several times that day. However, he could not state the exact times that he was on Hooter Road that night. Defendant further testified that he was dating Perreill at the time of the shootings and that he never asked her to lie or say anything to police that would benefit him.[10] He testified that he did not own either a 9 mm or a .40 caliber gun at the time of the shootings. Defendant further stated that he knows the victim, Troylynn, from school but that he did not see her on the night of the shootings and had not seen her in a very long time.[12]

[10] Defendant testified that he was arrested on February 20, 2014, and denied making a statement to the arresting officer that he knew the police were looking for him in connection with a shooting in the neighborhood. However, defendant subsequently testified that he did tell one officer that his mother told him that police had been to her house.

---

[12] State v. Bradstreet, 196 So.3d 876, 881-884 (La. App. 5th Cir. 2016); State Rec., Vol. 6 of 7.

8

**Petitioner's Claim**

**Sufficiency of the Evidence**

Petitioner claims that there was insufficient evidence to support his conviction. On direct appeal, the Louisiana Fifth Circuit Court of Appeal denied that claim, holding:

> We first consider defendant's claim that the evidence at trial was not sufficient to support his convictions. When the issues on appeal pertain to both sufficiency of the evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La. 1992). The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. King, 06–554 (La. App. 5 Cir. 1/16/07), 951 So.2d 384, 390, writ denied, 07–0371 (La. 5/4/07), 956 So.2d 600.
> An appellate court's primary function is not to redetermine the defendant's guilt or innocence in accordance with its appreciation of the facts and credibility of the witnesses. Rather, our function is to review the evidence in the light most favorable to the prosecution and determine whether there is sufficient evidence to support the fact-finder's conclusion. State v. Banford, 94–883 (La. App. 5 Cir. 3/15/95), 653 So.2d 671, 677.
> Evidence may be direct or circumstantial. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact can be inferred according to reason and common experience. State v. Williams, 05–59 (La. App. 5 Cir. 5/31/05), 904 So.2d 830, 833. All evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. State v. Bone, 12–34 (La. App. 5 Cir. 9/11/12), 107 So.3d 49, 58, writ denied, 12–2229 (La. 4/1/13), 110 So.3d 574; State v. Wooten, 99–181 (La. App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99–2057 (La. 1/14/00), 753 So.2d 208.
> Defendant was convicted of attempted second-degree murder in violation of La. R.S. 14:27 and 14:30.1. Second-degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm. La. R.S. 14:30.1. Attempt is defined as "[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended[.]" La. R.S. 14:27(A). The crime of attempted murder requires proof of the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. State v. Cepriano, 00–213 (La. App. 5 Cir. 8/29/00), 767 So.2d 893, 897.
> Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Because specific intent is a state of mind, it need not be proven as a fact, but may be inferred from the circumstances and

9

actions of the accused as well as the extent and severity of the victim's injuries.  Bone, 107 So.3d at 58; State v. Lewis, 97–160 (La. App. 5 Cir. 7/29/97), 698 So.2d 456, 459, writ denied, 97–2381 (La. 3/27/98), 716 So.2d 881.  It is well established that the act of aiming a lethal weapon and discharging it in the victim's direction supports a trier of fact's finding that the defendant acted with specific intent to kill.  See State v. Bone, supra; State v. Noble, 425 So.2d 734, 736 (La.1983).

Encompassed in proving the elements of an offense is the necessity of proving the identity of the defendant as the perpetrator.  When the key issue in the case is identification, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof.  State v. Abdul, 11–863 (La. App. 5 Cir. 4/24/12), 94 So.3d 801, 810–11, writs denied, 12–1224, 12–1226 (La.10/12/12), 99 So.3d 41; State v. Billard, 03–319 (La. App. 5 Cir. 7/29/03), 852 So.2d 1069, 1072, writ denied, 03–2437 (La. 2/6/04), 865 So.2d 739.  Positive identification by only one witness is sufficient to support a conviction.  State v. Williams, 02–645 (La. App. 5 Cir. 11/26/02), 833 So.2d 497, 503, writ denied, 02–3182 (La. 4/25/03), 842 So.2d 398.

Defendant contends that the evidence against him is insufficient because neither victim identified him at trial as being involved in the crime.  However, the testimony of other individuals reflects that Troylynn positively identified defendant as the individual who shot her.  This Court has previously determined that such a prior inconsistent statement is admissible in cases where a "witness' prior inconsistent statement also constitutes a prior statement of identification for purposes of La. C.E. art. 801(D)(1)(c).  Such a statement is not hearsay, may be used assertively as substantive evidence of guilt, and may be established through the testimony of one to whom the statement was made.  This is so even if the witness denies making an identification or fails or is unable to make an in-court identification."  State v. Robinson, 14–222 (La.App. 5 Cir. 9/24/14), 150 So.3d 900, 904 (citations and footnote omitted), writ denied, 14–2267 (La.8/28/15), 175 So.3d 964.

At trial, the State presented evidence to show that on January 20, 2014, defendant approached the two victims in Troylynn's driveway on Hooter Road and opened fire.  Both victims sustained gunshot wounds and 29 casings were recovered from the scene.  Further, the photographs of the scene reflect the severity and extent of the victims' injuries—Troylynn is seen in the photographs lying on the ground motionless with blood pouring from her side.

Although Troylynn did not identify defendant at trial, she previously identified defendant as the shooter by photographic lineup.  Troylynn's mother, Lynn Smith, testified that, at the hospital, Troylynn informed her that the individual who shot her lived on Hooter Road and further described the location of defendant's home and the first few letters of his name.  From that information, Detective Veal created a photographic lineup containing defendant's picture.  Detective Veal testified that Troylynn identified defendant immediately and with certainty in a photographic lineup as the shooter.  Further, Ms. Villemarette testified that she met with Troylynn multiple times prior to trial and that Troylynn was certain of the identity of the individual who shot her.[11]

---

[11]Although Mr. Washington never identified defendant as the person who shot him, we find the transferred intent doctrine applicable in this case.  This Court has found that the doctrine of transferred intent provides that "[w]hen a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing

10

or inflicting of great bodily harm would have been unlawful against the intended victim actually intended to be shot, then it would be unlawful against the person actually shot, even though that person was not the intended victim." State v. Baham, 14–653 (La. App. 5 Cir. 3/11/15), 169 So.3d 558, 566–67, writ denied, 15–0740 (La. 3/24/16), 190 So.3d 1189, quoting State v. Strogen, 35,871 (La. App. 2 Cir. 4/3/02), 814 So.2d 725, 728, writ denied, 02–1513 (La.12/13/02), 831 So.2d 983.

Defendant admitted at trial that his mother lives on Hooter Road and that he was in the area on the night of the shootings. Although defendant testified that he was at the Daiquiri Shoppe or with "another female" at the time of the shootings, defendant provided no alibi witnesses. Rather, Perreill, Nicki, and Ireal Chest refuted defendant's alibi and denied that defendant was with them at the Daiquiri Shoppe on the night of the shootings. Further, although the evidence reflects three separate weapons were utilized in the shootings and potentially multiple gunmen could have been involved, the law of principals states that all persons involved in the commission of a crime are equally culpable. State v. Massey, 11–357 (La. App. 5 Cir. 3/27/12), 91 So.3d 453, 463–64, writ denied, 12–0991 (La.9/21/12), 98 So.3d 332 (wherein this Court determined that whether a defendant actually fires the bullet that strikes the victim is of no consequence, and the defendant may be convicted equally as a principal to the crime).

Considering the record as a whole, we find the evidence presented at trial sufficient to support defendant's convictions for attempted second degree murder.

Defendant was also convicted of aggravated criminal damage to property. La. R.S. 14:55 defines aggravated criminal damage to property as "the intentional damaging of any structure, watercraft, or movable, wherein it is foreseeable that human life might be endangered, by any means other than fire or explosion." A conviction for aggravated criminal damage to property does not require a showing of specific intent; rather, the State must only show general intent, that is, that the defendant "voluntarily did the act." State v. Brumfield, 329 So.2d 181, 190 (La. 1976). At trial, the State introduced photographs of the scene, which reflect multiple bullet holes to a vehicle parked in the driveway at the scene of the crimes. Troylynn's mother, Lynn, testified that she owns the vehicle depicted in the photographs and that the bullet holes were not present prior to the night of the shootings. The photographs introduced into evidence reflect that Troylynn was shot in the driveway right next to Lynn's vehicle. Further, given the injuries sustained to the victims and the use of a firearm, it is foreseeable that human life might be endangered. Therefore, we find the evidence presented is sufficient to sustain a conviction for aggravated criminal damage to property. This assignment of error lacks merit.[13]

The Louisiana Supreme Court then likewise denied relief without assigning additional reasons.[14]

Because a sufficiency of the evidence claim presents a mixed question of law and fact, this Court must defer to the state court's decision rejecting this claim unless petitioner shows that the

---

[13] State v. Bradstreet, 196 So. 3d 876, 884-887 (La. App. 5th Cir. 2016); State Rec., Vol. 6 of 7.
[14] State v. Bradstreet, 220 So. 3d 752 (La. 2016) (mem.); State Rec., Vol. 7 of 7.

11

decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Taylor v. Day, Civ. Action No. 98-3190, 1999 WL 195515, at *3 (E.D. La. Apr. 6, 1999), aff'd, 213 F.3d 639 (5th Cir. 2000). For the following reasons, petitioner has not made such a showing.

As the Louisiana Fifth Circuit Court of Appeal correctly noted, claims of insufficient evidence are to be analyzed pursuant to the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979). In Jackson, the United States Supreme Court held that, in assessing such a claim, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319. Accordingly, "[t]he Jackson inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit.' " Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (quoting Herrera v. Collins, 506 U.S. 390, 402 (1993)) (emphasis added). Therefore, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.... Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011). Moreover, as the United States Fifth Circuit Court of Appeals has observed: "[A] state prisoner's burden is especially heavy on habeas review of the sufficiency of the evidence. The jury's finding of facts will be overturned only when necessary to preserve the fundamental protection of due process of law." Perez v. Cain, 529 F.3d 588, 594 (5th Cir. 2008) (quotation marks omitted). Further, because the state court's decision applying the already deferential Jackson standard must be assessed here under the strict and narrow standards of review mandated by the AEDPA, the standard to be applied by this Court is in

fact "twice-deferential." Parker v. Matthews, 132 S. Ct. 2148, 2152 (2012); see also Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012).

Additionally, it must be remembered that Louisiana's circumstantial evidence standard requiring that every reasonable hypothesis of innocence be excluded does not apply in federal habeas corpus proceedings; in these proceedings, only the Jackson standard need be satisfied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9 (5th Cir. 1992); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir. 2011); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *14 (E.D. La. Dec. 11, 2008); Wade v. Cain, Civil Action No. 05-0876, 2008 WL 2679519, at *6 (W.D. La. May 15, 2008) (Hornsby, M.J.) (adopted by Stagg, J., on July 3, 2008), aff'd, 372 F. App'x 549 (5th Cir. Apr. 9, 2010); see also Coleman, 132 S. Ct. at 2064 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

Petitioner was charged with, and convicted of, attempted second-degree murder and aggravated criminal damage to property. Louisiana defines "attempt" in La. Rev. Stat. § 14:27:

> A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
> B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime, shall be sufficient to constitute an attempt to commit the offense intended.
> …
> C. An attempt is a separate, but lesser, grade of the intended crime; and any person may be convicted of an attempt to commit a crime, although it appears on the trial that the

>crime intended or attempted was actually perpetrated by such person in pursuance of such attempt.

Second-degree murder is defined in relevant part by Louisiana law as "the killing of a human being ... [w]hen the offender has a specific intent to kill or to inflict great bodily harm." La. Rev. Stat. § 14:30.1(A)(1). The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. § 14:10(1). Under Louisiana law, intent need not be proven directly, but may be inferred from the actions of the defendant and the circumstances surrounding those actions. State v. Sharlhorne, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989); State v. Tate, 851 So.2d 921, 930 (La. 2003) (citing State v. Brooks, 505 So.2d 714, 717 (La. 1987)). Specific intent to kill can also be implied by the intentional use of a deadly weapon, such as a knife or gun. State v. Collins, 43 So.3d 244, 251 (La. App. 1st Cir. 2010) (citing State v. Brunet, 674 So.2d 344, 349 (1996)).

Louisiana law defines aggravated criminal damage to property as "the intentional damaging of any...movable, wherein it is foreseeable that human life might be endangered, by any means other than fire or explosion." La. Rev. Stat. § 14:55. A showing of specific intent is not required for a conviction for aggravated criminal damage to property; rather, the state must only show that the defendant "voluntarily did the act." State v. Brumfield, 329 So.2d 181, 190 (La. 1976)

Petitioner does not specifically contest the sufficiency of the proof related to the essential statutory elements of the offenses for which he was convicted, but rather, contends that the state failed to prove beyond a reasonable doubt his identity as the perpetrator. He contends that neither victim identified him as one of the shooters. Under Louisiana law, the state is required to prove the identity of the perpetrator in addition to the elements of the crime. State v. Draughn, 950 So.2d 583, 593 (La. 2007), cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007); State v. Thomas, 192 So.3d 291, 303 (La. App. 5th Cir. 2016); State v. Ingram, 888 So.2d 923, 926 (La. App. 5th Cir. 2004).

14

Where the key issue is identification, the State is required to negate any reasonable probability of misidentification. State v. Vasquez, 729 So.2d 65, 69 (La. App. 5th Cir. 1999). A positive identification by a victim, as well as the victim's testimony alone, also is sufficient identification evidence regarding the crime committed against that victim. Holderfield v. Jones, 903 F.Supp. 1011, 1017 (E.D. La. 1995) (citing State v. Turner, 591 So.2d 391 (La. App. 2d Cir. 1991)). Discrepancies in witness testimony go to credibility, which is a matter left to the judgment of the trier of fact, and an appellate court cannot reassess a credibility determination. State v. Thomas, 13 So.3d 603, 607 (La. App. 5th Cir. 2008).

The relevant evidence presented at trial was more than sufficient to establish, and petitioner does not contest, that Troylynn Smith and Joseph Washington both suffered gunshot wounds and that a vehicle was damaged during the shootings. To prove petitioner's identity as the perpetrator of the crimes, the state introduced evidence from multiple witnesses.

Troylynn Smith, who testified pursuant to a material witness warrant, claimed she could not recall the details of the shootings or what she told her mother after the shooting.[15] She claimed to have difficulties with her memory.[16] Troylynn Smith recalled that Detective Veal showed her a line-up of suspects and conceded her signature was on a photograph of petitioner.[17] She admitted that she saw two men walk by right before the shootings and that one of them said something to her, but claimed that she did not see their faces.[18] She testified that she had received threats relating to her appearance at trial.[19]

---

[15] State Rec., Vol. 5 of 7, Trial Transcript, pp. 19-21, 24-25, 29-30, 5/11/15.
[16] Id., at pp. 28, 31.
[17] Id., at pp.20, 30.
[18] Id., at pp. 24-25, 26.
[19] Id., at p. 23.

Detective Veal testified that he spoke with Lynn Smith who told her that Troylynn gave her a description of the shooter's house on Hooter Road as well as a few letters of his name.[20] Detective Veal determined that petitioner was connected to the home and fit the description that was provided by Troylynn Smith.[21] Troylynn Smith identified petitioner as the shooter from a photographic line-up.[22] Detective Veal admitted that she was on medication at the time of her identification of petitioner, but recalled that she was coherent.[23]

Deputy Patel testified that he responded to the scene of the shootings and spoke to Joseph Washington.[24] According to Patel, Washington told him that immediately prior to the shooting, one of the two black males who were walking by said, "What's up, T?".[25]

Deputy Pryor testified that he took petitioner's statement after his arrest.[26] Petitioner told Pryor that, on the evening of the shootings, he was with his girlfriend Perreill, her cousin Ireal, and another person inside the Daiquiri Shoppe watching a football game.[27] Through investigation, Pryor learned that there were no televised football games on the date of the shooting.[28] Pryor reviewed the videotape from the Daiquiri Shoppe and was unable to find petitioner on the video.[29]

Melanie Villemarette, a victim assistant coordinator for the District Attorney's Office, testified that she met with Troylnn Smith on several occasions and at no time did the victim express uncertainty

---

[20] Id., at p 39.
[21] Id., at p. 40.
[22] Id., at pp. 40-42, 47.
[23] Id., at pp. 41, 46-47.
[24] Id., at p. 51.
[25] Id., at pp. 51, 54.
[26] Id., at pp. 70-71.
[27] Id., at pp. 71-73, 79.
[28] Id., at p. 72.
[29] Id., at p. 73.

regarding the facts surrounding the shootings.[30] According to Villemarette, Troylynn Smith always stated that petitioner shot her.[31]

Lynn Smith testified that Troylynn Smith told her that the shooter was a boy Troylynn went to school with and that he lived down the street from them.[32] Lynn Smith provided Detective Veal with the address.[33]

Nikki Chest and Ireal Chest, cousins of Perreill Chest, both testified that they went to the Daiquiri Shoppe on the evening of the shootings, having been together at a parade earlier.[34] They both testified that petitioner was not with them at any point that day or evening.[35]

Perreill Chest testified that she and her cousins went to the Daiquiri Shoppe after the parade on the night of the shootings and that petitioner was not with them.[36] She admitted that petitioner called her from jail on several occasions and that she told him during those calls that he shouldn't have said he was with her on the evening of the shootings.[37] She further admitted to having given the police a statement in which she said petitioner was with her that evening.[38]

Detective Smith testified that petitioner initially fled during law enforcement's attempt to arrest him on February 20, 2014.[39] After his arrest, petitioner told Detective Smith that people in the neighborhood told him the police were looking for him because he was a suspect in the shootings.[40]

---

[30] Id., at pp. 82-83.
[31] Id., at pp. 82-83, 87.
[32] Id., at p. 103.
[33] Id.
[34] Id., at pp. 110; St. Rec., Vol. 6 of 7, Trial Transcript (con't), p. 117, 5/11/15.
[35] State Rec., Vol. 5 of 7, Trial Transcript, p. 110, 5/11/15; State Rec., Vol. 6 of 7, Trial Transcript (con't), p. 118, 5/11/15.
[36] Vol. 6 of 7, Trial Transcript (con't), pp. at 121, 129, 133, 138, 5/11/15.
[37] Id., at pp. 122, 125, 126 -129.
[38] Id., at p. 134.
[39] State Rec., Vol. 6 of 7, Trial Transcript, pp. 24-25, 27-28, 30, 5/12/15.
[40] Id., at pp. 26, 33.

17

Joseph Washington, who testified pursuant to a material witness warrant, stated that two men shot at him as he fled the scene and that he was hit in ankle.[41] Washington recalled that one of the shooters said, "What's up, Tee?" to Troylynn Smith just before the shootings began.[42] Washington claimed that he could not identify the shooters, but recalled that Troylynn told him that one of them lived on Hooter Road.[43]

Petitioner testified that he met Perreille Chest and her cousins at the Daiquiri Shoppe on the evening of the shootings, although he never went inside.[44] He claimed that, thereafter, he was likely with another female at his apartment on Westwood and that he then went to another house on Hooter Road, but that he did not get there until after the shootings.[45] Petitioner admitted that he ran from the law enforcement officers but claimed that he did not know who they were.[46] Petitioner claimed that Troylynn Smith, Detective Veal, Perreille Chest, and Detective Smith lied during their testimony.[47]

To the extent that petitioner is arguing that the jurors should not have found the state's witnesses credible, that simply is not for this Court to say. Credibility determinations are the province of the jurors, and a federal habeas court generally will not grant relief on a sufficiency claim grounded on such matters of credibility. See Schlup v. Delo, 513 U.S. 298, 330, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) ( "[U]nder Jackson [v. Virginia] 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979) ], the assessment of the credibility of witnesses is generally beyond the scope of review."); Ramirez v. Dretke, 398 F.3d 691, 695 (5th Cir.2005) ("All credibility choices and conflicting inferences are to be resolved in favor of the verdict."); McCowin v. Scott, No. 93–5340, 1994 WL 242581, at *2 (5th Cir. May 26, 1994) (A "challenge of the jury's credibility choice fails to satisfy the Jackson standard for

---

[41] State Rec., Vol. 6 of 7, Trial Transcript, pp. 18-19, 22, 28, 3, 5/15/15.
[42] Id., at pp. 33-34.
[43] Id., at pp. 33-34, 36.
[44] Id., at pp. 62-63, 70-71, 76
[45] Id., at pp. 63-64, 73
[46] Id., at p. 66-67.
[47] Id., at pp. 75-77.

habeas relief."); Phillips v. Cain, Civ. Action No. 11–2725, 2012 WL 2564926, at *14 (E.D. La. April 11, 2012), adopted, 2012 WL 2565025 (E.D. La. July 2, 2012); Picou v. Cain, Civ. Action No. 06–6258, 2007 WL 1521021, at *5 (E.D. La. May 22, 2007).

In summary, for the reasons explained by the Louisiana Fifth Circuit Court of Appeal, when the evidence in this case is viewed *in the light most favorable to the prosecution*, it simply cannot be said that the guilty verdict was *irrational*. Therefore, petitioner cannot show that the state court's decision rejecting his claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, under these doubly-deferential standards of review which must be applied by this federal habeas court, relief is not warranted.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Daylan Bradstreet be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); see Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this 10th day of December, 2018.

_____
**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

19